IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONTAE RICO WALLACE et al.       :
                                 :
v.                               :   Civil No. WMN-07-1140
                                 :
KENNEDY KRIEGER INSTITUTE        :
INC., et al.                     :

**MEMORANDUM**

Before the Court is Plaintiffs' motion to remand this action to the Circuit Court for Baltimore City, Maryland. Paper No. 35.[1] The motion has been fully briefed and is now ripe for review. Upon review of the pleadings and the applicable case law, the Court determines that no hearing is necessary and that the motion for remand will be granted.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This action arises out of Plaintiffs' participation in a non-therapeutic research program known as the "Lead-Paint Abatement Repair and Maintenance Study" (the study). The study was jointly funded by the United States Environmental Protection Agency (EPA) and the Maryland Department of Housing and Community Development (DHCD) and was designed to compare "the short and long-term efficacy of comprehensive lead-paint abatement and less costly and potentially more cost effective Repair and Maintenance

---

[1] Also pending before this Court is Defendant's Motion for Judgment on the Pleadings or, in the alternative, for Summary Judgment. Paper No. 28. As the Court has determined to remand this action, it will refrain from deciding the motion for judgment on the pleadings.

interventions for reducing levels of lead in residential house dust which in turn should reduce lead in children's blood." Quality Assurance Project Plan for the KKI Lead-Based Paint Abatement and Repair and Maint. Study (QAPjP), Chpt. 1, p. 1.

The study included five test groups of homes, each consisting of twenty-five residential dwellings in the Baltimore region.  Homes in the first three groups, referred to as Levels I, II and III, received partial lead abatement, with Level I receiving the least amount of repair and Level III receiving respectively more repair.[2]  Defendants were allegedly aware, however, that homes in Levels I, II, and III, continued to contain a certain level of lead-based paint and lead-based paint dust.  The fourth group of homes had once contained lead-based paint, but had since undergone a full lead abatement.  The homes in the fifth group were constructed after 1981 and, therefore, were presumed to be free of lead-based paint.  Periodically, the blood level of the minor children participating in the study was tested for the presence of lead in an attempt to determine the effectiveness of the varying intervention levels.

Plaintiffs are siblings who participated in the study as minor children.  Dontae Rico Wallace was born on March 16, 1989, and Searra Wallace was born on July 2, 1992.  From 1993 to 1997,

---

[2] In carrying out the study, researchers employed the term "intervention" to refer to the lead-based paint abatement procedures performed on a particular residence.

2

Plaintiffs resided in a home categorized in Group Level II. Plaintiffs allege that Defendants Kennedy Krieger Institute (KKI), Johns Hopkins University (JHU), and the Internal Review Board of the Johns Hopkins University School of Medicine's Joint Committee on Clinical Investigation (IRB),[3] jointly facilitated the administration of the study.  Individual Defendant Mark Farfel served as the director of the Division of Lead Poisoning Prevention at KKI and as the project manager of the study. Defendant Peter Lees served as a quality assurance officer and conducted system, performance and data audits on behalf of JHU. Defendant Helen Heath, individually and trading as "Lady H Enterprises," served as a subcontractor who performed interventions on the study homes.  Plaintiffs allege that KKI, Farfel and Lees coordinated with Defendants City Homes, Inc. and Barry Mankowitz, landlords of lead-containing homes, to secure homes for the study which would be rented to tenants with minor children between the ages of five months and four years old.[4]  In

---

[3] Individual Defendants Thomas R. Hendrix, Lewis C. Becker, David R. Cornblath, Paul Lietman, and Hayden G. Braine are each named as members of the IRB during the relevant period, along with Defendant John/Jane Doe, representing any unknown members of the IRB.

[4] Plaintiffs allege that, to entice parents to enroll their children in the study, KKI, Farfel and Lees offered the parents of the participants, "who by design were typically economically disadvantaged, monetary payments, food stamps, gift certificates, toys, gloves, hats, various trinkets, and free transportation" to and from the offices of the study site. Compl. ¶ 22.  KKI, Farfel and Lees also allegedly promised that

exchange, KKI, Farfel and Lees assisted City Homes and Mankowitz in applying for grants or forgivable loans to perform interventions.

To carry out the planning phase of the study, EPA initially contracted with Battelle Memorial Institute (Battelle), a science and technology center headquartered in Columbus, Ohio.  See Notice of Removal, Ex. C, "Work-Assignment" Section.[5]  The planning phase was scheduled to last from May 1990 through September 1990 and, during that time, Battelle was responsible for developing the schedule and financial plan for the entire project.  Id.  In June 1990, Battelle entered into a subcontract with KKI, assigning to KKI the responsibility for the completion of the planning phase of the study.  Notice of Removal, Ex. D. KKI planned the study in coordination with the Enterprise Foundation, City Homes, Inc., the Baltimore City Health Department, and the Maryland Department of the Environment.  In October 1993, and again in June 1994, EPA entered into contracts directly with KKI, awarding KKI $200,000 to continue in its

---

the participants' homes would receive special repairs, that the children would be tested for lead at KKI at no charge, that the results of the tests would be discussed with the parents, and that the study homes were free of lead hazards.  Id. ¶ 21.

[5]  The work assignment section of the initial EPA-Battelle Contract describes the four phases of the overall study: the planning phase, in which a schedule and financial plan would be developed; the pre-field phase, in which a Quality Assurance Project Plan (QAPjP) would be created and various protocols and procedures would be designed; the field phase, in which data would be collected and analyzed; and the reporting phase, in which data analysis would be completed.

4

administration of the study.  See Notice of Removal, Exs. L, M. DHCD provided separate funding to carry out the lead-based paint abatement interventions.[6]

On March 22, 2007, Plaintiffs brought the instant action in the Circuit Court for Baltimore City, Maryland.  In their Complaint, Plaintiffs allege eight counts: negligence (Counts I, IV, V and VI), negligent misrepresentation (Counts II, III), civil conspiracy (Count VII), and breach of fiduciary duty (Count VIII).  Compl. ¶¶ 37-89.  Defendants removed this action on the assertion that KKI and Farfel are entitled to removal pursuant to 28 U.S.C. § 1442(a)(1), as persons acting under an officer of the United States.  JHU and the IRB defendants also allege entitlement to removal pursuant to 28 U.S.C. § 1441, alleging federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II. DISCUSSION

### A.  Removal Under Section 1442(a)(1)

Defendants KKI and Farfel assert entitlement to removal pursuant to 28 U.S.C. § 1442(a)(1), which provides that a state court action may be removed by "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such

---

[6] Specifically, DCHD provided KKI "with access to $225,000 in new funds . . . and approximately $100,000 in existing funds to finance the preventative Repair and Maintenance interventions proposed for study[.]"  QAPjP, Chapt. 2, p. 1.

5

office[.]"  Section 1442 creates an exception to the well-pleaded complaint rule and is designed to "protect the exercise of legitimate federal authority by government agents against interference by individual states through their courts[.]"  14C Wright, Miller & Cooper, Federal Practice and Procedure § 3727 (3d ed. 1998).  To establish removal jurisdiction under this provision, a defendant must "(1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to plaintiffs' claims and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office."  Pack v. AC & S, Inc., 838 F. Supp. 1099, 1101 (D. Md. 1993) (citing Mesa v. California, 489 U.S. 121, 124-25, 129-31, 134-35 (1989)).  A defendant seeking removal bears the burden of demonstrating jurisdiction and, generally, due to federalism concerns, removal statutes are strictly construed and all doubts will be resolved against removal.  Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 260 (4th Cir. 2005).  Courts have interpreted the federal officer removal statute broadly when addressing the immunity of individual federal officials, and more narrowly in cases involving government contractors.  See Freiberg v. Swinerton & Walberg Prop. Servs., Inc., 245 F. Supp. 2d 1144, 1152 n.6 (D. Colo. 2002).

As Defendants KKI and Farfel are admittedly not officers of the United States, to remove this action under § 1442(a)(1), they must initially establish that they were "persons acting under the direction of a federal officer."  Wright, Miller & Cooper,

6

Federal Practice and Procedure § 3727.  Plaintiffs do not dispute that private corporations may be characterized as persons under § 1442(a)(1).  See Pack, 838 F. Supp. at 1103.  Plaintiffs contend, however, that KKI and Farfel have failed to demonstrate that they were acting under the direct and detailed control of a federal officer.  To demonstrate action under the direction of a federal officer for the purposes of § 1442(a)(1), a defendant must show that "the acts forming the basis of the state suit were performed pursuant to an officer's 'direct orders or comprehensive and detailed regulations.'"  Freiberg, 245 F. Supp. 2d at 1149-50 (quoting Ryan v. Dow Chem. Co., 781 F. Supp. 934, 947 (E.D.N.Y. 1992)).  Courts have held that this showing requires a defendant to demonstrate action under the direct control of an officer of the federal government, as opposed to the general control of an governmental agency.  See, e.g., Good v. Armstrong World Indus., Inc., 914 F. Supp 1125, 1129 (E.D. Pa. 1996) (holding that "[a]cting under the direction of the Navy . . . is not the same as acting under the direct and detailed control of a federal officer"); see also Ryan, 781 F. Supp. at 947 (noting that proof that "relevant acts occurred under the general auspices of a federal office or officer" or that "a corporation participates in a regulated industry" is insufficient).

   KKI and Farfel contend that the Notice of Removal expressly alleges action under the direction of a federal officer.  The Notice of Removal and the attached affidavit of Farfel, however, clearly refer to the "EPA," the "federal government," the "United

7

States Congress," and the "Department of Health and Human Services" as exercising control over the actions of KKI and Farfel.  See e.g., Notice of Removal ¶¶ 9-35; Aff. of Mark Farfel ¶ 1-12 (referring generally to "the EPA" as having participated in the design and control of the study).  In specifying the ways in which the EPA exercised control, the Notice of Removal briefly identifies the names of individual project officers and contract administrators with whom KKI and Farfel worked.  See, e.g., Notice of Removal ¶ 16 ("EPA approved every step of the design process.  For example . . . the contractor was required to submit a work plan to EPA Project Officer Elizabeth Margosches.") (internal citations omitted).  Additionally, Farfel's affidavit notes generally that "EPA Project Officers and staff conducted periodic site visits at [KKI]."  Aff. of Mark Farfel ¶ 9. General reference to multiple agency employees involved in the formation and administration of the relevant contracts, however, does not satisfy the assertion that Defendants were acting under the detailed direction and control of a federal official.  See Good, 914 F. Supp at 1129 (finding that reference to a "conglomerate of people employed by the United States Navy who had oversight authority does not support the blanket assertion by [Defendant] that the Secretary of the Navy provided direct and detailed control over [Defendant]").

More convincing to this Court's determination that removal was inappropriate under § 1442(a)(1), however, is the finding that KKI and Farfel have failed to demonstrate a causal nexus

8

between Plaintiffs' claims and acts allegedly performed under color of federal office.  The Complaint alleges injury resulting from KKI and Farfel's negligent management of the lead-based paint abatement interventions and their alleged misrepresentations and omissions with respect to lead levels in the Plaintiffs' dwelling and the potential harm resulting from exposure to that lead.  See, e.g., Compl. ¶¶ 37-42 (alleging that the intervention performed on Plaintiffs' home violated the Baltimore City Housing Code).  KKI and Farfel contend that the implementation of the interventions and the representations made to families participating in the study were governed under KKI's contracts with the EPA, and the protocols set forth in the corresponding QAPjP.  See Opp'n to Removal, pp. 11-16.  A closer reading of the controlling contracts and the QAPjP demonstrate, however, that, rather than being performed under the color of federal office, all activities concerning the implementation of the repair and maintenance interventions were expressly outside the scope of work to be performed under those contracts and were funded not by a federal agency, but by the Maryland Department of Housing and Community Development (DHCD).

The "Statement of Work" section of the subcontract between Batelle and KKI, entered into at the planning phase of the study, expressly notes that "[t]he preventative maintenance interventions would be funded from other sources.  This task would include funding for the evaluation of the abatement itself."  Notice of Removal, Ex. D (emphasis added).  The

9

"Statement of Work" included in the October 1993 contract between EPA and KKI specifically provides:

> The implementation of the repair and maintenance interventions of the Repair & Maintenance (R&M) study, that is, activities that modify the physical condition of the housing units, is beyond the scope of this contract.  All references to the R&M interventions in the Statement of Work, the QAPjP, or related documents are provided for clarity of reading and completeness, but are not to be construed as part of this Statement of Work.  These activities will be funded by the Maryland Department of Housing and Community Development under a separate financial vehicle.

Opp'n to Remand, Ex. G, p. 67.  Identical language is included in the "Statement of Work" section of the June 1994 contract between EPA and KKI.  Id. at Ex. H, p. 71.  With respect to the funding and design of the interventions, the QAPjP notes that "DHCD has provided access to $225,000 in new funds . . . and approximately $100,000 in existing funds to finance the preventative Repair and Maintenance interventions proposed for study[.]" Opp'n to Remand, Ex. K, Chpt. 2, p. 1; see also QAPjP, Appx. A (Letter from DCHD detailing the provision of R&M intervention funds).  The specific exclusion of the performance of the interventions from the contracts in question and the state sponsorship of those interventions reinforces this Court's conclusion that the conduct underlying Plaintiffs' claims was not performed at the direction of a federal officer and under the color of federal office.

### B.  Removal Under Section 1441

The IRB Defendants removed the causes of action asserted

against them pursuant to 28 U.S.C. § 1441, alleging federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Section 1331 provides district courts with original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The IRB Defendants contend that Plaintiffs' predicate their common law claims on duties defined under certain federal regulations.[7] Defendants further allege that exercise of federal jurisdiction would promote uniformity in the application and interpretation of federal law.

A case arises under federal law where federal law creates the cause of action or where "the vindication of a right under state law necessarily turn[s] on some construction of federal law[.]" Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 9 (1983). The mere presence of a federal issue in a state cause of action will not automatically confer federal question jurisdiction, rather, the plaintiff must show "(1) that the plaintiff's right to relief necessarily depends on a question of federal law, and (2) that the question of federal law is substantial." Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 816 (4th Cir. 2004). "If a plaintiff can establish, without the resolution of an issue of federal law, all of the essential elements of his state law claim, then the claim does not

---

[7] Specifically, the Complaint refers to 45 C.F.R. § 46.101, and 45 C.F.R. §§ 46.103-46.109. Those regulations impose standards of care that attach to federally funded or sponsored research projects that use human subjects.

11

necessarily depend on a question of federal law." Pinney v. Nokia, Inc., 402 F.3d 430, 442 (4th Cir. 2005). The Supreme Court has held that a state law claim alleging a violation of a federal statute as an element is not removable when Congress has not provided a private federal remedy for such a violation. Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 814 (1986) (finding that "the congressional determination that there should be no federal remedy for the violation of [the] statute is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction").

In their claims against the IRB Defendants, Plaintiffs cite duties established under several federal regulations in advancing common law causes of action. See, e.g., Compl. ¶¶ 51-59 (alleging negligence for failure to exercise reasonable care to ensure the safety of child research subjects in accordance with 45 C.F.R. § 46.101, et seq.). No private statutory cause of action exists for the violation of the regulations in question, thus, under Merrell Dow, the presence of the federal regulation as an element of the state law offense alone is not sufficient to establish federal jurisdiction. Defendants urge the Court to exercise jurisdiction, however, arguing that the Court's interest in uniformity of interpretation is substantial, particularly considering the dearth of litigation against IRBs. Defendants concerns about uniformity and the novelty of the federal issue

12

fail to create federal jurisdiction to Plaintiffs' claims.  See Merrell Dow, 478 U.S. at 816, 817 (noting that concerns of uniformity are mitigated by the availability of Supreme Court review and that the question whether a particular claim arises under federal law does not depend on the novelty of the federal issue).

Additionally, Plaintiffs argue that the alleged regulatory violations are cited merely as prima facie evidence of negligence, independent of Maryland's general common law duties which Defendants owed to Plaintiffs.  See Grimes v. Kennedy Krieger Inst., Inc., 782 A.2d 807, 849 (Md. 2001) (finding that, in Maryland, "a special relationship out of which duties might arise might be created by reason of the federally imposed regulations" and that the breach of independent duties imposed on researchers from alternative sources, such as the Nuremberg Code, "might well support actions sounding in negligence").  Plaintiffs' assertion that an independent duty of care may be applicable is also supported by language in the relevant regulations regarding the applicability of state law.[8]  Thus, because the essential elements of Plaintiffs' state law claims

---

[8] 45 C.F.R. § 46.101(f) provides: "This policy does not affect any state or local laws or regulations which may otherwise be applicable and which provide additional protections for human subjects."  45 C.F.R. § 46 116(e) provides: "The informed consent requirements in this policy are not intended to preempt any applicable federal, state, or local laws which require additional information to be disclosed in order for informed consent to be legally effective."

13

may exist independent of the regulatory duties, and because a violation of those duties do not give rise to a private federal cause of action, removal based upon federal question jurisdiction was not appropriate.

## IV. CONCLUSION

For the above stated reasons, Plaintiffs' Motion for Remand will be granted.  A separate order consistent with this memorandum will follow.

/s/
_____
William M. Nickerson
Senior United States District Judge

Dated: August 14, 2007

14